**RETAIL LEASE**

THIS LEASE is made by Landlord and Tenant as of the Date of Lease, all as defined in the Data Sheet below.

**DATA SHEET**

The following terms shall have the meanings set forth in this section, unless otherwise specifically modified elsewhere in this Lease:

(1)     "Landlord" and address:

Sherman Phoenix LLC
Attention: Ms. Juli Kaufmann
1850 W. Fond du Lac Ave
Milwaukee, Wisconsin 53205

(2)     "Tenant" and address:

| | |
|---|---|
| **Name:** | **Embody Yoga** |
| **Attention:** | **Joanna Brooks** |
| **Address:** | **5742 N. 80th St** |
| | **Milwaukee, WI. 53218** |

**(3)**     "Date of Lease": **June 1, 2018**

(4)     "Building": The mixed use commercial building containing the Premises to be located at 3536 W. Fond du Lac Avenue, Milwaukee, Wisconsin.

(5)     "Premises": The designated rentable Area in the Building which also includes shared access to common area interior seating, restrooms, customer parking and exterior patio as depicted on the attached Exhibit A. The parties acknowledge that Exhibit A may be altered, with the written consent of Landlord and Tenant, as the plans for the Premises and Building are finalized.

(6)     "Commencement Date": The date, anticipated to be **October 1, 2018,** when Landlord delivers to Tenant possession of Premises upon substantial completion of Landlord's Work. Landlord to provide 30 days written notice to Tenant prior to completion of Landlord Work.

(7)     "Rent Commencement Date": October 1, 2018.

(8)     "Expiration Date": September 30, 2021.

(9)     "Term": Three (3) years

(10)     "Permitted Uses": Tenant's use shall be as for the provision yoga and related services; provided that such use does not violate any exclusive or prohibited uses under any other lease for premises in the Building, now existing or granted in the future. Tenant may also sell retail products and gifts including but not limited to branded products and items related to the Permitted Use. Education and training may also be permitted on-site.

(11)     "Base Rent": **$9,600** per year, payable in equal monthly installments of **$800,** subject to adjustment as provided in Exhibit C.

(12)     "Additional Rent: **Proportionate allocations** will be made for utilities; **$0 fee** for employee parking ($25/ spot)**; $35 fee** for cleaning and security; **and $20** fee for internet;

(13)     "Trade Name": **Embody Yoga.**

(14)     "Landlord and Tenant Improvements": Improvements made to Premises as described in Exhibit B and also reference an "Equipment List" detailed in Exhibit A.

(15)     "Security Deposit": Payment equal to one Month Base Rent, payable by Date of Lease.

-1-

DEF000061

Article 1.     PREMISES

1.1     <u>Demise</u>.  Landlord leases to Tenant and Tenant rents from Landlord the Premises, for the Term and in accordance with the provisions of this Lease. Landlord represents and warrants that, upon completion of Landlord's Work, the Premises will comply with all applicable Federal and State of Wisconsin laws; provided, however, Tenant shall be solely responsible for compliance with all applicable laws in connection with the Tenant Improvements completed by Tenant.

1.2     <u>Common Areas</u>.  Tenant's use and occupancy of the Premises shall include the reasonable nonexclusive use of the "Common Areas," defined as public seating areas, shared bathrooms, exterior patio, parking areas, alleys, sidewalks, landscaped areas, and other areas so designated by Landlord within the Building.  Tenant shall not (a) encumber or obstruct the Common Areas, nor allow them to be obstructed or encumbered, nor place anything in the Common Areas without Landlord's prior consent; (b) sell, distribute, or solicit orders for sale or distribution of any merchandise, device, service, periodical, book, pamphlet, or other material whatsoever; (c) solicit membership in any organization, group or association or contribution for any purpose; or (d) use any Common Areas for any purpose when none of the other retail establishments within the Building is open for business or employment, except for activities previously approved in writing by Landlord.

1.3     <u>Building Systems</u>.  Landlord may install, use, maintain, repair and replace pipes, cables, conduits, plumbing, vents and telephone, electric and other wires and other items in the Premises to the extent Landlord deems appropriate for the proper operation and maintenance of the Building.

1.4     <u>No Easements</u>.  Landlord grants no implied easements under this Lease.  Landlord may close any portion of Building or Building to the extent as may, in Landlord's opinion, be necessary to prevent a dedication of or accrual of rights in those areas to any person or the public.

1.5     <u>Landlord's Access</u>.  Landlord shall have access to the Premises at all reasonable times and with reasonable notice, and at any time in an emergency, for inspection, showing for sale, performing maintenance and repairs and for all other purposes contemplated elsewhere in this Lease, and, not more than eight (8) months prior to expiration of the then-current term, showing for lease.

1.6     <u>Landlord's Title; Quiet Enjoyment</u>.  Landlord warrants that it owns the Building.  As long as no uncured Event of Default (defined below) exists and the Lease is in full force, Tenant may peaceably and quietly enjoy the Premises free from any claims of Landlord or persons claiming through Landlord, subject to the provisions of the Lease.

1.7     <u>Parking</u>.  Parking is provided in a shared 60+ parking lot contiguous to the north of the building. Exclusive use is not assured and spaces will be allocated to users at the discretion of Landlord.  Currently, parking for customer use is first-come, first-served and at no cost to customers or tenants.  This arrangement is subject to change, if notified in writing, pending use as it develops over time.  Employee and company vehicle parking may be made available and dedicated for a fee, to be separately agreed.

1.8     <u>Shared Interior Eating and Exterior Patio Areas</u>.  Tenant shall have a revocable license to use the "Shared Interior Eating and Exterior Patio" Areas, together in a shared arrangement with other tenants of the Building, for use by Tenant's customers to consume product sold from the Premises, subject to the following:

(a)     Tenant shall cooperate with other Tenants to maintain the Areas in a first-class condition, to include necessary repairs, cleaning, bussing, and keeping area free of trash and food spills and replacing dead and unsightly plants when needed or as directed by Landlord.  Landlord will provide for basic Common Area cleaning and maintenance, but Tenant also agrees to be responsible for assisting with the daily cleaning of the Areas.  In the event collaborative efforts fail to maintain the Areas in a neat, clean, sanitary, and safe condition, then Landlord, after giving Tenant at least twenty-four (24) hours' prior written notice (except no notice shall be required in the event of an emergency), shall have the right to take such action as may be necessary to clean and maintain the Areas, and Tenant shall reimburse Landlord upon demand for all cost incurred.

Case 2:20-cv-00035-PP   Filed 01/20/21   Page 2 of 29   Document 26-2

DEF000062

(b)     Tenant, at its sole cost and expense, shall promptly comply with all applicable governmental rules and regulations affecting the Areas including, but not limited to, those of the local health department and the applicable liquor authority. Tenant shall not be permitted to use music or loud speakers in Common Areas unless approved in advance by Landlord.

(c)     Except as provided above, Tenant's license to use the Areas shall be subject to all of the requirements and obligations of this Lease, including but not limited to, the insurance and indemnity provisions, as if the Areas were part of the Premises.

Article 2.     TERM

2.1     Commencement and Expiration Dates. The Term shall begin and end on the Commencement Date and the Expiration Date, respectively, specified in the Data Sheet.

2.2     Rent Prorations. In any partial month or year, or if Tenant is unable to operate its business in the Premises in the manner and on each day as required under this Lease due to fire or other casualty or condemnation of any part of the Building, Rent for the partial month, year or the time affected by Tenant's inability to operate shall be prorated on a daily basis.

2.3     Option to Extend. Provided (a) Tenant is not in default under this Lease at the time it exercises the Option to Extend (as defined below) or when the Extension Term (as defined below) is supposed to begin, (b) this Lease is in full force and effect and Tenant is open and operating in the all of the Premises,(c) Tenant has not been in default of the terms of this Lease two or more times (whether cured or uncured), Tenant shall have 1 option to extend the Term (an "Option to Extend") for a consecutive period of one (1) years (the "Extension Term") on the same terms presently contained in this Lease, except that Base Rent shall be as set forth on the attached Exhibit C. Tenant's exercise of an Option to Extend shall be automatic without further action by Landlord or Tenant. If Tenant does not desire to exercise an Option to Extend, Tenant shall notify Landlord of its election not to exercise an Option to Extend in writing at least six (6) months before expiration of the original Term or the then-current Extension Term, as the case may be, time being of the essence. The Option to Extend is personal to Tenant and is not transferrable to any assignee or subtenant.

Article 3.     USE

3.1     Permitted Uses. Tenant shall use the Premises only for Permitted Uses and for no other purpose without Landlord's prior consent, which may be withheld in Landlord's sole discretion. Tenant shall not, without Landlord's prior written consent, use the premises for any purpose that conflicts with any exclusives existing or to be granted to other tenants of the Building.

3.2     Staff and Merchandise. Tenant shall conduct its business at all times in a lawful manner, maintaining at all times a full staff of employees and a complete stock of merchandise.

3.3     Trade and Building Names. Tenant shall (1) operate its business in the Premises under the Trade Name, and no other, so long as such name shall not be held to be in violation of any applicable law; (2) not change the advertised name or character of the business operated in the Premises; and (3) refer to the Building by name designating the location of the Premises in all newspaper and other advertising and in all other references to the location of the Premises.

3.4     Signs.

(a)     Tenant may install and maintain one sign affixed to the front of the Premises subject to the prior written approval of Landlord as to design and location, and conforming to all applicable legal and insurance requirements. Tenant's signs shall be consistent with the specifications and requirements of Landlord. Tenant shall keep the sign visible during Tenant's hours of operation. Tenant shall pay for all costs in connection with the signs and shall be responsible for the cost of proper installation, maintenance, repair, removal, and replacement of the signs and any damage caused to the Premises, the Building or the Building by such activities.

-3-

DEF000063

(b)     Tenant shall not install or display any additional signs visible from the exterior of the Premises in, on, or about, the Premises or the Building without Landlord's prior written consent. Any sign or display visible from the exterior of the Premises which does not meet the above criteria may be removed at any time by Landlord at Tenant's sole cost and expense and without Landlord incurring any liability. Any interior signs must be tasteful and shall be prepared in a professional manner.

(c)     If Landlord deems it necessary to remove any sign or sign panel described in this Section, then Landlord shall have the right to do so Tenant shall, at Tenant's expense, replace all of its signs and sign panels on an as needed basis.

(d)     Upon the expiration or sooner termination of this Lease, Tenant shall at Tenant's expense remove all of its interior and exterior signage and all appurtenant installations from the Premises, including panels and electrical hook-ups, and shall restore the Premises to its condition before the installation of such signage. If Tenant fails or refuses to remove any such signage, and to restore the Premises as required, Landlord, without any further notice to Tenant, may remove and restore at Tenant's sole cost and expense, and Tenant shall pay such removal and restoration costs upon demand. In addition, Tenant shall upon demand reimburse Landlord for the costs of removing Tenant's sign panel(s), if any, from any monument signs at the Building. Tenant's obligations under this Paragraph shall survive expiration or sooner termination of this Lease.

3.5     Storage and Office Space. Tenant shall store or stock in the Premises only such goods, wares and merchandise as Tenant intends to offer for sale at, in, from, or upon the Premises.

3.6     Continuous Operation. Tenant shall continuously operate its business in the entire area of the Premises during its designated hours of operation. If Tenant violates the requirement of the preceding sentence for a period of thirty (30) consecutive days, or for thirty (30) days within any period of sixty (60) consecutive days (except as a result of casualty, condemnation, or Force Majeure), then in addition to all other rights and remedies available to Landlord by law or other provision of this Lease, Landlord may recapture the Premises and terminate this Lease.

3.7     Non-Competition. Tenant shall not at any time during the Term of this Lease, or extension of the Term, directly or indirectly operate, manage, or have any interest in a business which is the same as or similar in nature to the business permitted to Tenant under the Permitted Uses within a radius of one mile of the Premises without prior written consent of Landlord. If Tenant is a corporation, this provision shall also apply to Tenant's shareholders, directors, and officers. If Tenant is a limited liability company, this provision shall also apply to Tenant's members and managers. If Tenant is a partnership, this provision shall also apply to Tenant's partners.

3.8     Sales Reports. Intentionally Omitted.

3.9     Notice of Conditions. Landlord gives Tenant exclusive control of the Premises and shall have no obligation to inspect the Premises. Tenant shall promptly report to Landlord any defective condition in the Building known to Tenant. If Tenant fails to report any known defective condition, Tenant shall be responsible to Landlord for any liability or expense (including reasonable attorneys' fees) incurred by Landlord that would not have been incurred had Tenant promptly reported the defective condition to Landlord.

3.10     Rules. Tenant shall comply with the Rules attached as Exhibit D, as they may be amended or supplemented from time to time. Landlord shall not be responsible to Tenant for noncompliance by any other tenant of the Building with any of the Rules. Failure by Landlord to enforce any Rule against any tenant of the Building shall not constitute a waiver of that Rule.

3.11     Exclusive Uses. Landlord may grant other occupants of the Facility exclusive rights to engage in particular uses at the Building.

3.12     Tenant Exclusive. Landlord covenants and agrees that so long as the Tenant is not in default of this Lease and is open for business within the Premises (except for permitted temporary closures, or except as a result of casualty, condemnation, or Force Majeure), and until and to the extent that Landlord is not prohibited by any existing or future law, regulation, statute or court decision to do so and for so long as Tenant occupies and actively conducts its business from the Premises in accordance with the terms of this Lease for the Term, Landlord will not lease any

-4-

DEF000064

space in the Building to any tenant which sells the exact same food or alcoholic beverages or provides the exact same product or service. Similar, complementary or same generic products (such as coffee or beer) that are served in a differently branded context or as a secondary product may be allowed. In the event Tenant claims any violation by Landlord of the foregoing (as opposed to any rogue tenants of the Building who operate in contravention of the foregoing right of exclusivity without Landlord's consent), Tenant shall give to Landlord written and detailed notice and Landlord shall have a 30-day period after receipt of such notice to cure any such violation. Landlord shall use reasonable efforts to stop a violation by a rogue tenant.

  3.13 Compliance with Law and Other Matters. Tenant shall not commit or permit on the Building any (a) violation of law (including, without limitation, the Americans With Disabilities Act ("ADA"); (b) public or private nuisance; (c) act or condition in the Use that would invalidate or conflict with any insurance policy covering the Building or property in it or make insurance unavailable; (d) waste; or (e) other act or thing that could injure the reputation of the Building. Tenant represents and warrants that it is, and will at all times during the Term, be licensed, certified, or registered by the appropriate governmental agency to conduct its activities in the Premises. Tenant further represents and warrants that it shall maintain at all times, at its sole expense, all permits, licenses, certifications, or registrations that are required in connection with Tenant's activities in the Premises and allow Landlord to inspect such licenses and permits upon request.

  3.14 Alcoholic Beverages. Tenant must have advanced Landlord approval to seek a liquor license. If approved, Tenant shall comply with all applicable laws, regulations, ordinances and codes in effect from time to time regarding the sale and service of alcoholic beverages, including but not limited to restrictions regarding the service of alcoholic beverage to minors, the age of persons serving alcoholic beverages and the hours and days during which such beverages may be served. Tenant shall hold harmless, indemnify and defend Landlord and its members, employees, partners, officers and agents, from and against any and all liability, loss, cost, damage and/or expense (including reasonable attorneys' fees and expenses) of any kind or nature whatsoever, including, but not limited to, that resulting from any injury to or death of any persons or damage to or loss of property, by reason of or in any way relating to Tenant's sale or service of alcoholic beverages in the Premises including, but not limited to, liability under any dram shop law, host liquor law or similar laws, statutes or ordinances, whether now in effect or hereafter adopted by the State of Wisconsin, City of Milwaukee or any other governmental authority having jurisdiction or under common law.

Article 4. BASE RENT

  Tenant shall pay to Landlord, without set off, deduction or demand, Base Rent in monthly installments in advance on or before the first day of each month. Tenant agrees to complete necessary paperwork and permissions to allow Landlord to make automatic bank or other payment withdrawals to provide Base month plus Additional Rent and Fees directly to Landlord by each monthly due date.

Article 5. PERCENTAGE RENT

Intentionally Omitted.

Article 6. ADDITIONAL RENT

  6.1 Taxes. Landlord shall be responsible for Taxes. For purposes of this Lease, "Taxes" shall mean all governmental charges levied or assessed against Landlord, the Building or any part of it as a result of Landlord's ownership of the Building.

  6.2 Operating Expenses. Landlord shall be responsible for certain Operating Expenses where noted. Tenant shall be responsible for certain Operating Expenses where noted.

  (a) For purposes of this Lease, "Operating Expenses" shall mean all expenses incurred by Landlord with respect to the ownership and operation of the Building as determined by Landlord in accordance with accounting principles consistently followed. The term includes, but is not limited to, the following expenses:

-5-

DEF000065

(1) Insurance: Premiums for general property and building liability insurance are the responsibility of the Landlord.

(2) Costs of services, supplies and materials incurred in connection with cleaning, maintenance, repairs, security, garbage removal, recycling services, snow removal and redecorating that may be provided by Landlord to the Tenant Premises under this Lease are the responsibility of Tenant. Costs of services, supplies and materials incurred in connection with these services that may be provided by Landlord to the Common Areas under this Lease are the responsibility of Tenant, based on a fee allocation per rata to all Tenants as noted as Cleaning Fee on Data Sheet.

(3) Water, sewer, natural gas, heating oil, electricity, and any other utility charges are the responsibility of the Tenant to be allocated on a per rata basis to all Tenants.

(4) Telephone, cable television, internet service are the responsibility of Tenants to provide for and pay accept for Wifi internet provided to Common Areas for fee noted on Data Sheet.

(5) Reasonable management fees at the Building are the responsibility of the Landlord.

(b) The foregoing definition notwithstanding, Operating Expenses shall not include the following expenses and any such expenses, if necessary, are the responsibility of the Landlord:

(1) Taxes, as defined above.

(2) Costs paid to Landlord's affiliates to the extent they exceed competitive levels.

(3) Costs of any capital improvement to the Building or depreciation allowance or expense, except as specifically included above.

(4) Costs of repairing or replacing any items covered by insurance or warranty, to the extent insurance or warranty proceeds are made available to Landlord to pay the costs.

(5) Costs of leasing, procuring or renovating space for occupants of the Building.

(6) Interest and principal payments on any loan or ground rental payments.

(7) Reserves for future expenses.

(8) Bad debt expenses or reserves.

(9) Costs related to any refinancing or sale of the Building.

(10) Costs in connection with any dispute relating to Landlord's title to the Building.

(11) Costs resulting from Landlord's or its agents' negligence, violation of law, violation of any lease in the Building or failure to pay any bill before delinquency.

6.3 Payment. Tenant shall pay as "Additional Rent," without set off, deduction or demand, Operating Expenses noted as Tenant Responsibility under any other provision of this Lease concurrently with the next succeeding installment of Base Rent following notice of the amount of the Additional Rent, unless a different time for payment is specified in this Lease.

6.4 Estimate. Intentionally omitted.
6.5 Annual Adjustment. Intentionally omitted.
6.6 Other Adjustments. Intentionally omitted.

-6-

DEF000066
Case 2:20-cv-00035-PP    Filed 01/20/21    Page 6 of 29    Document 26-2

6.7     <u>Personal Property Taxes</u>. Tenant shall pay prior to delinquency all taxes imposed on Tenant's improvements, fixtures or personal property in the Premises. Tenant shall request a separate assessment and billing for these taxes. If taxing authorities include in calculating Taxes on the Building the value of any property belonging to Tenant, Tenant shall pay all Taxes attributable to that property directly to the taxing authorities.

6.8     <u>Utilities</u>. Tenant shall pay for all utilities or services furnished to the Premises or used by Tenant, including water, sewer, gas, electricity, fuel, light, heat, power and cable television, whether determined by separate metering or billed by Landlord to Tenant as Tenant's Percentage of Operating Expenses. Landlord shall not be liable for any interruption or failure in the supply of utilities to the Premises; provided, however, that if the interruption or cessation of utilities resulted from a cause within Landlord's control and the Premises are not usable by Tenant for the conduct of Tenant's business as a result thereof, Base Rent and applicable Operating Expenses shall be abated for the period which commences five (5) business days after the date Tenant gives to Landlord written notice of such interruption until such time as the utilities required for the conduct of Tenant's business are restored. Tenant shall not be entitled to such abatement if Tenant is in fact conducting business in the Premises during such interruption of utilities or if Tenant caused the interruption of utilities.

6.9     <u>Extension</u>. Landlord's failure to notify Tenant of an amount due from Tenant under this Article shall not be a waiver of Landlord's right to collect that amount, but shall extend the time for Tenant's payment to a date allowing Tenant the period of time otherwise allowed for making the payment had Landlord notified Tenant on time.

Article 7.     SECURITY DEPOSIT Intentionally Omitted.

Article 8.     INSURANCE, RELEASES, AND INDEMNIFICATIONS

8.1     <u>Landlord's Insurance</u>.

(a)     Landlord shall keep the Building insured for Landlord's own benefit in an amount equal to the Building's replacement value (excluding deductibles, co-insurance and foundation, grading and excavation costs) on an all risk basis, including rental interruption insurance.

(b)     Landlord shall maintain, for its benefit and the benefit of its managing agent and mortgagees of the Building (if any), commercial general liability insurance against claims for personal injury, death or property damage occurring at the Building.

(c)     These insurance provisions shall not limit or modify Tenant's obligations under any provision of this Lease. All insurance premiums paid by Landlord with respect to the Building shall be considered "Operating Expenses."

8.2     <u>Tenant's Insurance</u>.

(a)     Tenant shall at its expense keep all machinery, equipment, furniture, fixtures, personal property and business interests located at the Premises and not belonging to Landlord insured for Tenant's benefit, in an amount equal to the lesser of their full replacement value or insurable value, on an "all-risk" basis.

(b)     Tenant shall at its expense maintain commercial general liability insurance for the mutual benefit of Landlord, mortgagees of the Premises, and Tenant against claims for personal injury, death or property damage (including contractual liability coverage applicable to this Lease and insuring Tenant's indemnification obligations provided for below) occurring at the Premises, in amounts of at least $1,000,000 per occurrence and $2,000,000 annual aggregate.

(c)     If Tenant sells alcoholic beverages in the Premises, maintain (1) dram shop insurance with total limits of liability for bodily injury, loss of means of support, and property damage because of each occurrence of not less than $1,000,000.00, or such greater amounts as Landlord may reasonably require, indemnifying Landlord, its members, partners, agents and assigns, Tenant and such other persons (who have an insurable interest) as Landlord

-7-

DEF000067

may designate, against any and all liability relating to the use, sale or giving away of alcoholic beverages; and (2) product liability insurance with limits of liability of not less than $1,000,000.00 per occurrence..

(d)     Insurance policies maintained pursuant to this section shall be written by companies reasonably satisfactory to Landlord that are licensed or authorized to do business and in good standing in the state where the Premises is located and have a general policyholder's rating of at least A and a financial rating of at least XI in the most current <u>Best's Insurance Reports</u> available. The original policies or certificates of insurance, and renewals or replacements at least 30 days before expiration of coverage, shall be delivered to Landlord with evidence satisfactory to Landlord that the premiums have been paid. The policies shall not be terminable without 30 days prior written notice to Landlord. Any such coverage shall be deemed primary to any liability coverage secured by Landlord.

8.3     <u>Releases</u>.

(a)     Insurance policies maintained pursuant to this Article for loss or damage by fire or other risks shall permit releases of liability as provided below and include waiver of subrogation clauses as to Tenant and Landlord respectively. Landlord and Tenant waive and release and discharge each other from all claims or demands arising out of damage to destruction or loss of use of property caused by fire or other casualty arising due to any act or omission of the other or otherwise and agree to look only to their respective insurance coverages in the event of such a loss. Notwithstanding the foregoing releases, if any damage to the Building results from any act or omission of Tenant and any of Landlord's loss is deductible, Tenant shall pay to Landlord the deductible amount. This paragraph shall not affect Tenant's repair obligations under other provisions of this Lease.

(b)     To the extent not prohibited by law, Tenant waives all claims, and Landlord shall not be liable to Tenant, for damage during the Term to Tenant's property or business, including consequential damages, occurring at the Building unless caused by the negligence or willful misconduct of Landlord, it's agents, contractors or invitees. This paragraph shall apply especially, but not exclusively, to damage caused by water, snow, frost, steam, refrigerators, sprinkling devices, air conditioning apparatus, excessive heat or cold, falling plaster, broken glass, sewage, gas, odors, noise, bursting or leaking of pipes or plumbing fixtures or the flooding of basements or other subsurface areas and shall apply equally whether damage results from any of the foregoing causes or otherwise. Tenant shall have rights to pursue and/or make claims against other tenant's in the event their errors, omissions, or negligence results in damages to Tenant.

(c)     All property in the Building belonging to Tenant shall be at Tenant's sole risk except as otherwise provided in this paragraph. Landlord shall not be liable for damage, theft or loss affecting this property except that resulting from the willful misconduct or gross negligence of Landlord, it's agents, contractors or invitees. Tenant shall defend and indemnify Landlord against claims and liability for injuries to this property except those caused by the willful misconduct or gross negligence of Landlord, it's agents, contractors or invitees.

(d)     Landlord does not warrant that any of the services Landlord may supply will be free from interruption and these services are subject to all laws, ordinances, regulations and guidelines of governmental authorities. Tenant acknowledges that any one or more of these services may be suspended by reason of accident, repairs, alterations, improvements or causes beyond Landlord's control. Any such interruption of service shall not be deemed an eviction or disturbance of Tenant's use and possession of the Premises or any part of it or render Landlord liable to Tenant for damages by abatement of Rent or relieve Tenant from performance of its obligations under this Lease,.

8.4     <u>Indemnifications</u>.

(a)     Subject to Paragraph (c), Tenant shall indemnify Landlord against any and all damages claimed to be suffered by third parties (including reasonable attorneys' fees and all other costs and liabilities incurred in connection with any action or proceeding brought with respect to such a claim) arising from any (1) default by Tenant under this Lease, (2) condition inconsistent with any representation or warranty made by Tenant under this Lease, except to the extent caused by Landlord, (3) act or negligence by Tenant or (4) accident, injury or damage in or about the Premises or the Building to the extent caused by Tenant. If an action or proceeding is brought against Landlord with respect to such a claim, Tenant, on notice from Landlord, shall resist or defend the action or proceeding by counsel reasonably satisfactory to Landlord.

-8-

DEF000068

(b) Subject to Paragraph (c), Landlord shall indemnify Tenant against any and all damages claimed to be suffered by third parties (including reasonable attorneys' fees and all other costs and liabilities incurred in connection with any action or proceeding brought with respect to such a claim) arising from any (1) default by Landlord under this Lease, (2) condition inconsistent with any representation or warranty made by Landlord under this Lease, except to the extent caused by Tenant, (3) act or negligence by Landlord or (4) accident, injury or damage in or about the Building to the extent caused by Landlord. If an action or proceeding is brought against Tenant with respect to such a claim, Landlord, on notice from Tenant, shall resist or defend the action or proceeding by counsel reasonably satisfactory to Tenant.

(c) Whenever Landlord and Tenant are jointly responsible (whether with each other or with others) for damages suffered by a third party, their indemnification obligations under this Section shall be limited to their respective percentages of responsibility for the damages.

(d) These indemnification obligations do not apply to the extent Landlord and Tenant have released each other from claims elsewhere in this Lease.

(e) These indemnification obligations shall survive expiration or earlier termination of this Lease.

Article 9.        HAZARDOUS MATERIALS

9.1        Definitions. For purposes of this Lease:

(a) "Hazardous Material" is used in its broadest sense and means any asbestos, petroleum based products, pesticides, paints and solvents, polychlorinated biphenyl, lead, cyanide, DDT, acids, ammonium compounds and other chemical products and any substance or material defined or designated as a hazardous or toxic substance, material, waste, or other similar term, by any Environmental Law.

(b) "Environmental Law" is used in its broadest sense and means any federal, state, or local statute, ordinance, regulation, or court or administrative order affecting the Building presently in effect or promulgated in the future, as amended from time to time, regulating hazardous or toxic substances, including but not limited to the following statutes:

(1) Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq.

(2) Comprehensive Environmental Response, Compensation and Liability Act of 1980, 40 U.S.C. § 1801 et seq.

(3) Clean Air Act, 42 U.S.C. §§ 7401-7626.

(4) Water Pollution Control Act (Clean Water Act of 1977), 33 U.S.C. § 1251 et seq.

(5) Insecticide, Fungicide and Rodenticide Act (Pesticide Act of 1987), 7 U.S.C. § 135 et seq.

(6) Toxic Substances Control Act, 15 U.S.C. § 2601 et seq.

(7) Safe Drinking Water Act, 42 U.S.C. § 300(f) et seq.

(8) National Environmental Policy Act (NEPA) 42 U.S.C. § 4321 et seq.

(9) Refuse Act of 1899, 33 U.S.C. § 407 et seq.

Case 2:20-cv-00035-PP   Filed 01/20/21   Page 9 of 29   Document 26-2

DEF000069

9.2     Tenant's Covenants.  Tenant shall not cause or permit any Hazardous Material to be brought on, kept, stored or used in or about the Building by Tenant without Landlord's consent (which Landlord shall not unreasonably withhold as long as Tenant demonstrates to Landlord's reasonable satisfaction that the Hazardous Material is necessary for Permitted Uses and will at all times be used, kept, stored and disposed of in a manner that complies at all times with all Environmental Laws and will not create an undue risk to other occupants of the Building, giving consideration to the nature of the Building).  Tenant shall not cause or permit any Hazardous Material to be brought on, kept, stored or used in or about the Building by Tenant with or without the permission of Landlord, in violation of any Environmental Laws.  Tenant shall promptly notify Landlord of any possible contamination of the Building that becomes known to Tenant.

9.3     Remediation.  In addition to Tenant's other obligations under this Lease, if the presence of any Hazardous Material at the Building caused or permitted by Tenant results in any contamination of the Building or the violation of law, Tenant shall be responsible for the cost of all actions necessary to return the Building to the condition existing prior to the introduction of the Hazardous Material or the violation of law.  Landlord shall have the option of taking such actions at Tenant's expense or requiring Tenant to do so itself.  If Landlord requires Tenant take any such action, any work required on the Building shall be treated as if it were an alteration to the Building subject to Article 10 below.  Further, Tenant shall on demand pay Landlord the amount, if any, by which the Building's value has decreased as a result of the contamination or violation.  Tenant's obligations under this Paragraph shall survive expiration or earlier termination of this Lease.

9.4     Representation by Landlord.  Landlord represents that to Landlord's knowledge the Premises and the Building are free from contamination by Hazardous Materials.  Landlord shall not cause or permit any Hazardous Material to be brought on, kept, stored or used in or about the Building in violation of any Environmental Laws.

Article 10.     MAINTENANCE AND REPAIRS

10.1     By Landlord.  Landlord shall maintain the roof, exterior, and structural components of the Building and the Common Areas of the Building in good order and repair and in compliance with applicable law.  All reasonable expenses paid by Landlord with respect to such work that was not caused by Landlord's negligence in properly maintaining the Building and Common Areas, shall be considered "Operating Expenses."  Landlord may temporarily close off Common Areas or entries to the Building or temporarily suspend services or amenities to facilitate maintenance and repair work.  Landlord shall use reasonable efforts to schedule and perform maintenance and repairs so as to minimize interference with Tenant's use of the Premises. Any provisions of this Lease to the contrary notwithstanding, unless caused by a casualty against which Tenant is required to insure, Landlord shall at its expense promptly repair to Tenant's satisfaction all damage to the Building caused by any act or omission of Landlord.  All such repairs shall be in quality and class at least equal to the original work and shall comply with all applicable laws.

10.2     By Tenant.  Tenant shall at its expense keep the Premises and the systems and fixtures servicing the Premises and Tenant's signage in good order, condition, and repair, reasonable wear and tear excepted.  Without limiting the generality of the preceding sentence, Tenant shall maintain the storefront of the Premises in an attractive condition, clean all outside windows and doors in the Premises on a regular basis, and perform annual and routine maintenance to all of Tenant's fixtures and equipment as required by Landlord.

10.3     Restaurant Equipment Maintenance.  If Tenant serves food, Tenant shall at its expense maintain in good repair, and so as to meet the standards of cleanliness and health, in a manner consistent with the operation of a first-class restaurant, and in accordance with all applicable laws, codes, regulations and ordinances, all kitchen waste and exhaust systems, including all risers, piping and fans used in connection with such waste and exhaust systems, whether located in or outside of the Premises, including, the hood, grease trap pipes and pans, and all other pipes or ducts used by Tenant.  Tenant shall cause the restaurant equipment to be cleaned regularly and as often as necessary to prevent clogging or discharge.  In the event of any such overflow or discharge, Tenant shall be responsible for all costs of cleanup of the overflow or discharge, including all costs of repair, restoration or replacement of property damaged by such overflow or discharge.

Article 11.     IMPROVEMENTS AND ALTERATIONS

-10-

DEF000070

11.1    Consent Required. Except for the Tenant Improvements, Tenant shall not make any improvements or alterations to the Premises ("Work") without Landlord's prior consent, which may be withheld in Landlord's reasonable discretion. Without limiting the generality of the preceding sentence, no radio, television or other communication antenna, equipment, wiring, or other device may be mounted, attached or secured to any part of the roof, exterior surface, or anywhere outside the Premises without such consent. Landlord may condition its consent on its receipt of copies of contracts, plans, specifications, permits and licenses, and on third party indemnifications, performance bonds and evidence of insurance reasonably satisfactory to Landlord.

11.2    Labor. All Work projects costing more than $10,000 or $1 per rentable square foot in the Premises, whichever is less, or affecting the Building's structure, roof, or mechanical, electrical, or plumbing systems regardless of cost, shall be done only under Landlord's supervision by contractors or mechanics reasonably satisfactory to Landlord, at Landlord's option, and at such times and in such manner as Landlord reasonably designates. Tenant shall do no Work of a nature or in a manner likely to result in a labor dispute or materially interfere with operation of the Building.

11.3    Compliance and Quality. All Work shall comply with all applicable laws and insurance requirements (including, without limitation, worker's compensation insurance laws and requirements) and shall be performed in a good and workmanlike manner. All materials shall be new and of at least as good a quality as those installed in the Premises on the Commencement Date. Tenant shall permit Landlord to inspect construction operations in connection with the Work. Landlord's approval and inspection of the Work shall not constitute an assumption of responsibility for the accuracy and sufficiency of Tenant's plans and specifications, or their compliance, or the compliance of any Work, with applicable law, all of which shall be entirely Tenant's responsibility.

11.4    Expenses. Tenant shall pay the cost of all Work, reasonable costs of Landlord's review of materials provided as a condition of its consent, reasonable charges for Landlord's supervisory services (if any) and the cost of restoring the Building to the condition that existed before commencement of the Work. On completion of the Work, Tenant shall furnish Landlord with contractor's affidavits, full and final lien waivers and receipted bills covering all labor and materials.

11.5    Liens. Tenant shall notify all contractors that their lien rights attach only to Tenant's interest in the Premises, and Landlord shall be entitled to post a notice in the Premises to that effect during any Work. Tenant shall cause to be discharged or bonded over, within 10 business days after filing, any construction lien claim filed against the Building for work or materials claimed to have been performed for or furnished to or on behalf of Tenant.

11.6    Title to Improvements; Plans. Except for personal property, equipment and trade fixtures, all improvements constructed by Tenant on the Premises shall be Landlord's property. Tenant shall be responsible for repairing any damage caused to the Premises by removal of Tenant's personal property, equipment, and trade fixtures. Upon completion of any Work, Tenant shall furnish Landlord with a correct and complete set of as-built plans and specifications for the Work completed.

11.7    Removal of Improvements. Landlord, by notice to Tenant, may require Tenant to remove at Tenant's expense (a) at any time, any improvements made by Tenant in the Premises and not included in Tenant's Improvements or consented to by Landlord pursuant to this Article; (b) on termination of this Lease or Tenant's right of possession, any improvements made by Landlord or Tenant whose removal is necessary to permit re-leasing; and (c) in either case, to repair any damage caused by installation or removal; provided, however, Tenant may remove only those items specified in Landlord's notice and any items that are Tenant's property.

11.8    Indemnification. Tenant shall defend and indemnify Landlord against any and all claims and liability connected with any and all Work.

11.9    Survival of Obligations. Tenant's obligations under Sections 11.5, 11.6, 11.8, and 11.9 shall survive expiration or earlier termination of this Lease.

Case 2:20-cv-00035-PP    Filed 01/20/21    Page 11 of 29    Document 26-2

DEF000071

Article 12.    RELOCATION

Intentionally Omitted.

Article 13.    ASSIGNMENT AND SUBLETTING

13.1    Notice to Landlord. Tenant shall not, without Landlord's prior consent, (a) assign this Lease or any interest under it by voluntary act, operation of law or otherwise; (b) sublet the Premises or any part of it; or (c) permit the use of the Premises by any parties other than Tenant and its previously approved assignees and subtenants. Tenant shall notify Landlord of Tenant's intent, as of a stated date (the "Transfer Date") at least 30 days after notice, to assign this Lease or sublet part or all of the Premises for the balance or part of the Term. Tenant's notice shall state the consideration for and all other terms of the proposed assignment or sublease and the name and address of the proposed assignee or subtenant and shall include a complete copy of the proposed assignment or sublease. Notwithstanding anything contained herein to the contrary, Tenant may assign this Lease or sublet the Premises or any portion thereof, without Landlord's prior consent, to any entity (a "Permitted Assignee") (i) which controls, is controlled by or is under common control with Tenant, (ii) resulting from the merger or consolidation with Tenant, or (iii) which acquires all or substantially all of the assets or ownership interests of Tenant, provided that said assignee assumes, in full, the obligations of Tenant under this Lease. Tenant shall send written notice to Landlord of any assignment or sublease to a Permitted Assignee within 15 days following any such assignment or sublease.

13.2    Landlord's Consent. Landlord's consent to a proposed assignment or subletting may be withheld in Landlord's absolute discretion. If Landlord does not consent within 10 business days after Tenant's notice, Landlord's consent shall be deemed withheld.

13.3    Recapture. Landlord may, by notice to Tenant within 10 business days after Tenant's notice of a proposed assignment or subletting, recapture the space described in Tenant's notice and terminate this Lease with respect to the recaptured space as of the Transfer Date. If this Lease is terminated with respect to less than the entire Premises, Rent shall be equitably adjusted as of the date of recapture with due consideration of the size, location, type and quality of the part of the Premises remaining after recapture.

13.4    Tenant's Profits.

(a)    Tenant shall pay to Landlord upon receipt an amount equal to 50% of all Assignment Proceeds (defined below).

(b)    For purposes of this Section, "Assignment Proceeds" shall mean all consideration payable to Tenant, or Tenant's designee, directly or indirectly, by any assignee or subtenant, or any other entity or person related to, or affiliated with, any assignee or subtenant, or any other amount received by Tenant or any entity or person related to, or affiliated with, Tenant (including, but not limited to, any subsidiary or sister corporation) from, by reason of, or in connection with any assignment or sublease (including, but not limited to, sums paid for the sale, rental, or use, or consideration received on account of any contribution, of Tenant's Property (defined below) after deducting from such consideration:

(1)    Tenant's reasonable out-of-pocket costs and expenses in making the assignment or sublease, such as broker's fees, attorneys' fees, and advertising fees, but only to the extent actually incurred and paid by Tenant to unrelated third parties in connection with the assignment or sublease;

(2)    The cost of improvements or alterations made by Tenant expressly and solely for the purpose of preparing the Premises for the assignment or sublease, as determined by Tenant's federal income tax returns;

(3)    The then unamortized or undepreciated cost of all Improvements determined on the basis of Tenant's federal income tax returns, reduced by any Tenant Improvement Allowance given to Tenant by Landlord;

Case 2:20-cv-00035-PP    Filed 01/20/21    Page 12 of 29    Document 26-2

DEF000072

(4)     The then unamortized or undepreciated cost of any of Tenant's Property leased to the assignee or subtenant determined on the basis of Tenant's federal income tax returns;

(5)     In the event of a sale or contribution of Tenant's Property, the then unamortized or undepreciated cost of the sold or contributed Tenant's Property determined on the basis of Tenant's federal income tax returns; and

(6)     In the case of any sublease, Rent.

(c)     Tenant agrees to promptly furnish Landlord with information (including, but not limited to, receipts) regarding the payment the costs and expenses listed in Paragraphs (b)(1) through (b)(6) of this Section, as Landlord may request from time to time.

(d)     If the consideration paid to Tenant for any assignment or sublease shall be paid in installments, by lease or otherwise, then the costs and expenses specified in Paragraph (b) of this Section shall be amortized over the period during which the installments shall be payable.

(e)     For purposes of this Section, "Tenant's Property" shall mean Tenant's movable fixtures and movable partitions, telephone, and other equipment, furniture, furnishings, decorations, and other items of personal property.

13.5     <u>Landlord's Expenses, Indemnification</u>.     Tenant shall promptly on demand pay Landlord's reasonable attorneys' fees and other expenses incident to a review of any documentation related to any proposed assignment or sublease, up to $1,000.00. Tenant shall indemnify and defend Landlord against any and all loss, costs, damages, and liabilities resulting from any claims that may be made against Landlord by proposed assignees or subtenants of Tenant or by brokers or any other persons claiming commissions or any other compensation in connection with any proposed assignment or sublease, whether or not the applicable part of the Premises is recaptured and rented by Landlord to the proposed occupant or anyone else. Further, if this Lease is terminated as to all or any part of the Premises pursuant to this Article, Tenant shall at its expense discharge any outstanding commission obligation of Landlord with respect to the applicable part of the Premises.

13.6     <u>Financing Statements</u>. Tenant shall not enter into, execute, or deliver any financing statement or security agreement that can be given priority over any mortgagee given by Landlord or its successors.

13.7     <u>Effect of Noncompliance</u>. Any sale, assignment, mortgage, transfer or sublease of the Premises by Tenant not in compliance with this Article shall be void.

Article 14.     DAMAGE

14.1     <u>Repairs</u>. If damage to the Building renders a material part of the Premises unusable for Permitted Uses and the damage can be substantially repaired within 120 days using standard working methods, then unless this Lease is terminated pursuant to this Article, Landlord shall promptly and diligently (and in any event no later than 120 days after the date of the damage) restore the damaged areas (excluding any improvements not included in the Improvements) to substantially the same condition that existed before the damage. If the damage was not caused or contributed to by any act or omission of Tenant, Rent shall be apportioned on a daily and square footage basis and abated proportionately until repairs are completed. Landlord shall provide written notice to Tenant no later than 90 days after the date of damage to notify Tenant whether work will be completed within 30 days. If Landlord does not timely complete repairs, Tenant may terminate this Lease by notice to Landlord within 30 days after the deadline for completion, unless repairs are completed before notice of termination. However, Tenant may not terminate this Lease if its willful misconduct caused the damage unless Landlord is not promptly and diligently repairing the Building.

14.2     <u>Termination</u>.

-13-

DEF000073

(a)     Either party may terminate this Lease if damage to the Building renders a material part of the Premises unusable for Permitted Uses and the damage cannot be substantially repaired within 120 days using standard working methods.

(b)     Landlord may also terminate this Lease, provided Landlord also terminates all similarly affected leases in the Building, if (1) more than 33% of the Building is damaged and Landlord elects not to repair the damage; (2) a mortgagee of the Building does not allow adequate insurance proceeds to repair damage to the Building; (3) damage to the Building is not covered by insurance Landlord is required to maintain under this Lease; (4) Landlord in good faith settles its insurance claims relative to the damage for less than the amount required to make repairs; or (5) the Building is damaged during the last 12 months of the Term.

(c)     To terminate the Lease under this Section, a party must notify the other party within 30 days after discovery of the event allowing termination and before the damage is repaired, specifying a termination date at least 30 but not more than 60 days after the notice date.

## Article 15.     EMINENT DOMAIN

15.1     Definition.  "Taken" means acquired by the power of eminent domain or any similar governmental power or in lieu of condemnation.

15.2     Termination.

(a)     If the entire Premises, or portions of the Building sufficient to render the entire Premises unusable for Permitted Uses, are permanently taken, this Lease shall terminate as of the date title vests in the condemning authority or the date the Premises become unusable, whichever occurs first.

(b)     If any part of the Building is permanently taken and Landlord elects to restore the Building in a manner that materially alters the Premises, Landlord may terminate this Lease.  If sufficient portions of the Building are permanently taken so as to materially interfere with Tenant's use of the Premises for Permitted Uses, Tenant may terminate this Lease.  To terminate the Lease under this Paragraph, a party must notify the other party within 30 days after the date title vests in the condemning authority, specifying the termination date at least 30 but not more than 60 days after the notice date.

15.3     Damages.  All damages awarded for any taking of the fee and leasehold interests in the Building shall belong to Landlord.  Tenant may prove in any proceedings and receive a separate award for any other condemnation awards available under applicable law.

15.4     Restoration.  If a partial taking of the Building occurs and this Lease is not terminated pursuant to this Article, Base Rent and Tenant's Percentage shall be adjusted based on the remaining size, character, and value of the Premises and the Building and Landlord shall restore the Building (excluding any improvements in the Premises that are not included in the Improvements) as nearly as reasonably possible to a complete architectural unit with all due diligence, but only to the extent of available condemnation proceeds.

## Article 16.     MORTGAGEES AND PURCHASERS

16.1     Priority.  Tenant's rights under this Lease are and shall always be subordinate to any and all mortgages, deeds of trust, ground leases and other security instruments (each a "Mortgage") now or in the future encumbering the Building or any part of it and to amendments, replacements, renewals and extensions of Mortgages, provided that Tenant's use and occupancy of the Premises shall not be disturbed by any mortgagee, trustee, ground lessor or other secured party (each a "Mortgagee") under any Mortgage as long as no uncured Event of Default (defined below) exists and the Lease is in full force.  This clause shall be self-operative and no further instrument of subordination shall be required, but Tenant shall execute such further assurance, containing such reasonable provisions, as Landlord or any Mortgagee may request.  Any Mortgagee may elect that this Lease shall have priority

-14-

DEF000074

over its Mortgage and on notification of this election by a Mortgagee to Tenant, this Lease shall be deemed to have such priority whether the Lease is dated before or after the date of the Mortgage.

16.2     Estoppel Certificates.  Tenant shall, from time to time on Landlord's written request, execute, acknowledge and deliver to Landlord or its designee a written certification stating: (a) the date this Lease was executed and the date it expires; (b) the date Tenant entered into occupancy of the Premises; (c) the amounts of each component of Rent and any Security Deposit and the date to which each component of Rent has been paid; (d) that this Lease is unmodified and in full force and effect (or if modified that the Lease as modified is in full force and effect and stating the modifications); (e) that Landlord is not in default under this Lease (or if in default the specific nature of the default); and (f) other matters as may be reasonably requested by Landlord or any Mortgagee or prospective purchaser of the Building.  Tenant shall modify the foregoing certification to reflect accurately the status of this Lease.  Any prospective purchaser or Mortgagee may rely on any certification delivered pursuant to this paragraph.  If Tenant fails to respond within 10 business days after request by Landlord for a certification, Tenant shall be conclusively deemed to have admitted the accuracy of any information Landlord supplies to a prospective purchaser or Mortgagee to the effect that this Lease is in full force and effect, that there are no uncured defaults in Landlord's performance, that any Security Deposit is as stated in this Lease and that not more than one month's Base Rent has been paid in advance, unless Landlord has actual knowledge to the contrary.

16.3     Intentionally Omitted.

16.4     Mortgagee's Right to Cure.  Provided a Mortgagee notifies Tenant in writing of its address, Tenant shall give the Mortgagee, by certified or registered mail, a copy of any notice of default served on Landlord and agrees that the Mortgagee may, but need not, cure any such defaults.

16.5     Transfer of Landlord's Interest.  If Landlord's interest in the Building or any part of it is transferred (other than transfers for security purposes only, but including transfers via foreclosure), Landlord shall have no responsibility for the Landlord's obligations accruing after the transfer, and the transferee shall have no responsibility for Landlord's obligations accruing before the date of transfer, including liability for any Security Deposit (unless the transferee receives a credit from Landlord for any Security Deposit).  Tenant shall attorn in writing to the transferee, provided the transferee assumes, in writing, the future Landlord's obligations under the Lease.

## Article 17.     RIGHTS RESERVED TO LANDLORD

Landlord reserves the following rights exercisable without notice or liability to Tenant and without effecting a constructive or actual eviction or disturbance of Tenant's use or possession or giving rise to any claim for set off or abatement of Rent:

17.1     Identification of Building.  Except as otherwise provided elsewhere in this Lease, to change the name, address, number or designation by which the Building is commonly known.

17.2     Service Contractors.  To reasonably restrict and control any service in or to the Premises including, but not limited to, provision of sign painting and lettering.

17.3     Control of Building.  Provided Tenant's access to and use of the Premises for Permitted Uses is not materially impaired, to reduce, increase, enclose or otherwise change the size, number and location of buildings, layout and nature of the Building and the other tenancies, premises and buildings included in the Building, construct additional buildings and additions to any building, increase the size of the Building by adding parcels of land to it, convey portions of the Building and reduce the size or restrict Tenant's use of the Common Areas.

17.4     Separate Utilities.  To separate any utilities being provided on a centralized basis (either by separate meters or by sub-meters) and to centralize any utilities being provided on a separated basis, the costs of either of which shall be included in Operating Expenses in their entirety in the year during which they are incurred.

DEF000075

Article 18.    SURRENDER OF PREMISES

18.1    Condition of Premises. Tenant shall notify Landlord at least 30 days before vacating the Premises to arrange for a joint inspection of the Premises. If Tenant fails to give notice and arrange an inspection, Landlord's inspection after Tenant vacates the Premises shall be conclusively deemed correct for purposes of determining Tenant's responsibility for repairs to the Premises. On the Expiration Date or on earlier termination of this Lease, Tenant shall peaceably surrender the Premises in good order and in a condition consistent with Tenant's repair obligations under this Lease, and shall surrender at the place then fixed for payment of Rent all keys for the Premises and shall inform Landlord of combinations of any vaults, locks and safes left at the Premises.

18.2    Removal of Property. On or before the Expiration Date or the date of earlier termination of this Lease, Tenant shall, at its expense, remove all property owned by or in the custody of Tenant from the Premises; all property not timely removed shall be deemed abandoned at Landlord's option. Tenant appoints Landlord its agent to remove its property from the Premises on termination of this Lease and to cause transportation and storage of Tenant's property for Tenant's benefit, all at Tenant's sole cost and risk, and Landlord shall not be liable for any damage to or loss or theft of any of the property. Tenant shall reimburse Landlord on demand for any expenses incurred by Landlord with respect to removal, transportation or storage of abandoned property or with respect to restoring the Premises to the condition required on surrender.

18.3    Holdover Rent. If Tenant remains in possession of the Premises after expiration or earlier termination of this Lease without the extension of this Lease or execution of a new lease, Tenant shall be deemed to be occupying the Premises without claim of right and Tenant shall pay for each day of occupancy an amount equal to 150% of the daily rate of Rent immediately preceding the holdover.

18.4    Consequential Damages. In addition to the remedies available at law or equity or under this Lease, if Tenant shall fail, by expiration of the Term or sooner termination of this Lease, to surrender the Premises, restore the Premises to the condition required under this Lease upon such expiration or sooner termination, or remove all its items of property from the Premises, Landlord shall be entitled to recover all of the following damages from Tenant as a consequence of such failure:

(a)    Lost rental or other income resulting from Landlord's inability to timely deliver possession of the Premises to a new tenant or occupant.

(b)    Costs incurred by Landlord due to Landlord's inability to timely deliver possession of the Premises to a new tenant or occupant including, without limitation, holdover rent payable by such new tenant or occupant to its landlord, additional storage, moving, and relocation expenses incurred by such new tenant or occupant, and the costs and expenses of any temporary premises for such new tenant or occupant.

(c)    Costs incurred by Landlord of restoring the Premises to the condition required by this Lease on an expedited basis including, without limitation, loan financing costs, interest, and overtime labor costs.

Article 19.    DEFAULT AND REMEDIES

19.1    Default By Tenant.

(a)    Each of the following events is an "Event of Default":

(1)    Tenant fails to pay to Landlord any payments due under this Lease when due and nonpayment continues for 10 business days after notice from Landlord.

(2)    Tenant fails to perform any of Tenant's other obligations under this Lease and nonperformance continues for 30 days after notice from Landlord, provided that if the nonperformance cannot be cured within 30 days, the cure period shall be extended for as long as reasonably necessary as long as Tenant is diligently pursuing cure.

DEF000076

(3)     This Lease or any of Tenant's rights under it is levied upon under any attachment or execution and the attachment or execution is not vacated within 30 days.

(4)     Tenant or any guarantor of this Lease, is dissolved or becomes the subject of a petition in bankruptcy or insolvency or for liquidation, reorganization or involuntary dissolution or for the appointment of a receiver or trustee of all or any of its property or makes an assignment for the benefit of its creditors or petitions for or enters into an arrangement with its creditors

(b)     If an event occurs that, with the giving of notice or the passage of time, would be an Event of Default, Landlord may, without notice and in addition to all other rights and remedies available to Landlord by law or other provision of this Lease, exercise any or all of the following remedies:

(1)     If any Rent is not paid on time, charge Tenant 5% of the amount of the overdue payment as liquidated damages for Landlord's extra expense in handling the past due account.

(2)     If any other obligation is not performed on time, without waiving or releasing Tenant from any obligations, perform the obligation for the account and at the expense of Tenant.

(3)     Restrain by injunction the attempted or threatened violation of this Lease.

(c)     If an Event of Default occurs, Landlord may, in addition to all other rights and remedies available to Landlord by law or other provision of this Lease, exercise any or all of the following remedies:

(1)     Take any of the actions specified in paragraph (b) above, to the extent not already taken.

(2)     Restrain by injunction the violation of this Lease.

(3)     Without legal process or notice to Tenant (except to the extent required by applicable law), immediately re-enter the Premises, and remove all persons and property.

(4)     Terminate this Lease.

(d)     Landlord may, at its option, at any time after this Lease is terminated pursuant to the preceding Paragraph, require Tenant to pay Landlord, in lieu of any further deficiency in Base Rent and Additional Rent, the "Accelerated Rent" discounted to present value as provided below.

(1)     The "Accelerated Rent" shall be an amount equal to (a) Base Rent and Additional Rent that would have been payable over the balance of the Term from the date of Tenant's default to the stated Expiration Date of this Lease (as if this Lease had not been terminated), less (b) the fair and reasonable rental value of the Premises for the corresponding period. The annual Additional Rent payable over the balance of the Term from the date of Tenant's default to the stated Expiration Date of this Lease shall equal the Additional Rent payable pursuant to Article 6 during the 12-month period immediately preceding the date of termination of this Lease. If fewer than 12 months have elapsed between the Commencement Date and such termination date, the annual Additional Rent shall equal the average monthly Additional Rent payable under Article 6 for the calendar months immediately preceding such termination multiplied by 12. The fair and reasonable rental value of the Premises shall be determined in good faith by Landlord on the basis of the rents payable under leases entered into by Landlord for comparable space in the Facility during the 12-month period immediately preceding Landlord's election to require Tenant to pay the Accelerated Rent; or, if Landlord determines that no such leases for comparable space have been entered into, then the fair and reasonable rental value shall be otherwise determined by Landlord in good faith. If Landlord relets the Premises or any part of the Premises before any adjudication of Landlord's claims for damages, the amount of rent payable to Landlord for such reletting shall be deemed the fair and reasonable rental value of the Premises (or the applicable part of the Premises) during the term of the reletting.

(2)     The Accelerated Rent shall be discounted to the date payable at an annual interest rate equal to the then current yield of actively traded U.S. Treasury bonds with maturities equal to the balance of the

-17-

DEF000077
Case 2:20-cv-00035-PP     Filed 01/20/21     Page 17 of 29     Document 26-2

Term, as published in the Federal Reserve Statistical Release for the week prior to the mailing of the notice of acceleration. If the balance of the Term is not equal to any bond maturity for which such yield is published, such yield shall be determined by linear interpolation between the yields for the two closest bond maturities for which such yield is published.

(3)     Upon payment of the Accelerated Rent discounted to present value, Tenant shall be released from all further liability under this Lease for payment of any deficiency in Base Rent and Additional Rent, except for all accrued and outstanding obligations and any costs incurred by Landlord due to Tenant's default as provided under Paragraph (g) below.

(e)     Anything in this Lease to the contrary notwithstanding, and without limiting Landlord's other rights and remedies provided for in this Lease or at law or equity, if Tenant is in default under any covenant, condition, or agreement of this Lease more than one time within any 12-month period, irrespective of whether or not such default is cured, Landlord, at its sole election and in its sole and absolute discretion, may do one or more of the following:

(1)     Increase the Security Deposit by an amount that Landlord determines, in its sole and absolute discretion, is necessary to protect its interests, such increase to be paid by Tenant immediately upon demand by Landlord.

(2)     Charge a fee, on the second occurrence of Tenant's violation of such covenant, condition, or agreement and each time thereafter, as Additional Rent, of $500.00, such fee to increase by 25% with each additional violation of this Lease.

(3)     If such defaults concern overdue Rent or any other charges owing under this Lease, require that, beginning with the first monthly installment of Rent next due, the Rent shall no longer be paid in monthly installments, but shall be payable in advance on a quarterly basis, on the first day of the first month of the quarter.

(4)     If such defaults concern overdue Rent or any other charges owing under this Lease, require Tenant to pay all Rent and other charges due under this Lease by automatic transfer.

(5)     Declare a noncurable Event of Default under the Lease.

(6)     Cancel Tenant's Options to Extend.

(f)     Tenant waives any and all rights of redemption or reinstatement granted by law if Tenant is declared in default and given notice of termination or evicted or dispossessed for any cause or if Landlord obtains possession of the Premises by reason of Tenant's violation of this Lease or otherwise.

(g)     Tenant shall indemnify Landlord against all damages Landlord may incur by reason of termination of this Lease including, but not limited to, loss or diminution of rents; costs to secure the Premises; costs of preparing the Premises for reletting (including the cost of making such repairs, alterations, replacements, and decorations to the Premises as Landlord may consider desirable or necessary); and costs of renting the Premises to another tenant (including brokers' commissions, reasonable attorneys' fees and disbursements, advertising costs, and rent concessions).

19.2    Default by Landlord.

(a)     If Landlord fails to perform any of Landlord's obligations under this Lease and nonperformance continues for 30 days after notice from Tenant (or if such default cannot be cured within such 30 day period, within such longer period of time as may be reasonably necessary to cure such default so long as Landlord in good faith commences to cure the failure or breach within such 30 day period and thereafter continuously and with reasonable diligence proceeds to cure such breach), Landlord shall be in default, and Tenant may (but shall not be required) to cure the default, subject to the following conditions:

-18-

DEF000078

Case 2:20-cv-00035-PP   Filed 01/20/21   Page 18 of 29   Document 26-2

(1) Tenant shall notify Landlord in writing of its intent to resort to its self-help remedy under this Paragraph, and shall include in such notice a request for all pertinent information regarding any warranties that might be in effect regarding the particular maintenance, repairs, or replacements to be made. Landlord shall provide the warranty information within 5 business days after request.

(2) This paragraph shall not apply if Tenant, in its reasonable discretion, determines that Tenant does not have time to wait for Landlord to provide warranty information and pursue correcting Landlord's default through a warranty claim. If Tenant does not request pertinent warranty information prior to resorting to its self-help remedy, breaches any term or condition of the warranties, or does not fully observe all of the terms and conditions of the warranties, then Tenant shall be liable to Landlord for any and all claims, actions, damages, and expenses in connection with the breach or nonobservance. This liability shall survive expiration or earlier termination of this Lease.

(3) Notwithstanding the provisions of Subparagraph (2) of this Paragraph, if Landlord does not furnish the warranty information within the 5 business-day period specified by Subparagraph (1) of this Paragraph, then Tenant shall not be held accountable for the breach or nonobservance of the terms or provisions of any applicable warranty as long as all the maintenance, repairs, and replacements are performed in accordance with the terms of this Lease.

If Tenant exercises its self-help remedy under this Paragraph, Landlord shall reimburse Tenant on demand for reasonable costs incurred by Tenant in curing the default. If Tenant resorts to its self-help remedy under this Section, Tenant shall use Landlord's roofing contractor to make any required roof repairs (to the extent such contractor is immediately available) and, regardless of any contractor Tenant uses to perform any such work, Tenant shall defend and indemnify and hold Landlord harmless from any and all claims, actions, damages, costs and expenses incurred by Landlord in connection with the breach or nonperformance of any term or condition of any warranties or the voiding of any warranties affecting the Building, including, but not limited to, any roof warranty. This remedy shall be in addition to any other right or remedy Tenant has by law, except the right to terminate this Lease, which Tenant waives.

(b) Anything in this Lease to the contrary notwithstanding, Landlord's obligations, representations and warranties in this Lease are not personal obligations, representations and warranties or binding on any of Landlord's assets except Landlord's interest in the Building, as it may from time to time be encumbered. No personal liability arising from this Lease or Landlord's obligations under it shall be asserted or enforceable against Landlord or its partners, coventurers, shareholders, directors or officers or their respective heirs, legal representatives, successors or assigns.

(c) All of Tenant's covenants and obligations under this Lease are independent of Landlord's covenants and obligations. Tenant shall neither be relieved from the performance of any of its covenants and obligations (including, without limitation, the obligation to pay Rent) nor entitled to terminate this Lease, due to breach or default by Landlord of any of its covenants or obligations, unless expressly permitted by the terms of this Lease.

19.3    Interest. Any amounts owing from Tenant to Landlord under this Lease and not paid within any applicable grace period after the date due shall bear interest from the date due until paid at the lesser of (a) 4% over the prime rate of interest published in The Wall Street Journal (Midwest Edition), adjusted from time to time as such prime rate changes; or (b) the highest rate of interest permitted in the State of Wisconsin for similar obligations.

19.4    Attorneys' Fees. Tenant shall pay Landlord's reasonable attorneys' fees and costs in connection with any successful legal action by Landlord to enforce this Lease. Likewise, Landlord shall pay Tenant's reasonable attorneys' fees and costs in connection with any successful legal action by Tennant to enforce this Lease.

19.5    Forbearance. Landlord's failure to insist on the strict performance of any of Tenant's obligations under this Lease, or to exercise any option under this Lease, shall not be deemed to be a waiver of the obligation or option, regardless of Landlord's knowledge of the preceding breach at the time of acceptance of Rent.

19.6    Waiver of Jury Trial and Counterclaims. Landlord, and all of Landlord's successors and assignees and Tenant and all of Tenant's successors, subtenants, and assignees (together, for purposes of this Section,

DEF090079

"Landlord" and "Tenant" respectively) waive trial by jury in any action, proceeding or counterclaim brought by either party (except for personal injury or property damage) on all matters connected with this Lease, the parties' relationship as landlord and tenant, Tenant's use or occupancy of the Premises and any statutory or other remedy. Neither Landlord nor Tenant may interpose any noncompulsory counterclaims in a summary proceeding or other action based on termination or holdover.

19.7     No Accord and Satisfaction.  No payment or receipt by Tenant of a lesser amount than the monetary obligations due under this Lease shall be deemed to be other than on account of the earliest obligations due, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and Landlord may accept any check or payment without prejudice to its right to recover the balance of the obligations or pursue any other remedy.  No receipt for money from Tenant after termination of this Lease, service of any notice, commencement of any suit or final judgment for possession of the Premises shall reinstate, continue or extend the Term or affect any such notice, demand or suit or imply consent for any action for which Landlord's consent is required, unless specifically agreed by Landlord in writing.  Any amounts received by Landlord may be allocated to any specific amounts due from Tenant as Landlord determines.

Article 20.     MISCELLANEOUS PROVISIONS

20.1     No Reservation.  Submission of this Lease for examination does not constitute a reservation or option to lease the Premises.  This Lease becomes effective as a lease only on execution and delivery by Landlord and Tenant.  Landlord's employees and agents have no authority to make or agree to make a lease or other agreement.

20.2     Persons Bound.  This Lease binds and benefits Landlord and Tenant and their heirs, executors, administrators, successors and assigns.  If multiple parties execute this Lease as Tenant, their liability shall be joint and several.

20.3     Interpretation.

(a)     This Lease shall be interpreted according to and governed by the internal laws of the state in which the Building is located.

(b)     Captions to the Articles and Sections of this Lease are not a part of the Lease and shall have no effect on the interpretation of any part of it.

(c)     The relationship of Landlord and Tenant created by this Lease shall not constitute or be construed as a partnership, principal-agent relationship, joint venture or other cooperative enterprise.

(d)     If any provision of this Lease is proven to be illegal or unenforceable, it shall be deemed modified to the minimum extent and for the minimum amount of time necessary to eliminate the illegality or unenforceability.  If the intent of any provision of this Lease so indicates, the parties' respective obligations under the provision shall survive expiration or earlier termination of the Lease.

(e)     This Lease contains all agreements between Landlord and Tenant relating to its subject matter.  Any and all prior agreements or understandings are superseded.  Each party acknowledges that neither the other party nor its agents have made any promises or representations in connection with this Lease except as set forth in this Lease and agrees that no claim or liability shall be asserted for, and neither party shall be liable for, breach of any promise or representation not stated in this Lease.

20.4     Managing Agent.  Landlord's rights and remedies under this Lease or provided by law may be executed in Landlord's own name or in the name of its managing agent (if any) and all legal proceedings for the enforcement of rights or remedies may be commenced and prosecuted to final judgment and execution in Landlord's own name or in the name of its managing agent.

DEF000080
Case 2:20-cv-00035-PP   Filed 01/20/21   Page 20 of 29   Document 26-2

20.5    Dates; Force Majeure.

(a)    Whenever this Lease requires payment of money on demand or without specifying a deadline, payment shall be required by the next date an installment of Rent is due or within 10 business days, whichever is later.

(b)    Whenever this Lease requires performance of an obligation other than payment of money on demand or without specifying a deadline, performance shall be required within 30 days.

(c)    Except where otherwise indicated, time is of the essence of this Lease. However, if weather conditions, natural disaster, fire, war, civil unrest, labor unrest, or similar circumstances beyond a party's reasonable control prevent timely performance of an obligation other than payment of money, the time for performance shall be extended by the amount of time performance is prevented.

20.6    Authority. Each person signing this Lease warrants personally that he or she has the authority to bind the party on whose behalf he or she signs to this Lease, and each party shall furnish to the other on reasonable demand evidence of this authority.

20.7    Office of Foreign Assets Control Provisions.

(a)    Tenant certifies as follows:

(1)    It is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control.

(2)    It is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity, or nation.

(b)    Tenant shall defend, indemnify, and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities, and expenses (including attorneys' fees and costs) arising from or related to any breach of the foregoing certifications.

20.8    Memorandum. Neither party shall record any memorandum of this Lease or short form lease.

20.9    Brokers. Each party warrants that it has not engaged any broker, finder or other person who would be entitled to any commission or fees in respect of the negotiation, execution or delivery of this Lease. Each party shall be solely responsible for compensating its own broker (if any), and shall defend and indemnify the other against any claims, expenses or liabilities incurred by the other as a result of any brokerage arrangements or agreements made or alleged to have been made by or on behalf of the indemnifying party.

20.10    Early Termination; Amendment. Whenever any provision of this Lease terminates the Lease before the Expiration Date, or changes any other provision of the Lease, the termination or change shall promptly be confirmed by written agreement between Landlord and Tenant. However, until the parties execute such an agreement, the Lease shall nevertheless be deemed terminated or amended. Otherwise, this Lease (except for the Rules) may not be modified except in writing signed by Landlord and Tenant, and by a mortgagee of the Building if the mortgagee so requires.

20.11    Notices and Consents. All notices and consents required or permitted under this Lease must be in writing served either personally, by registered or certified mail, postage prepaid, or by overnight courier service, and shall be deemed given when personally delivered, postmarked or given to the courier service. The parties' respective addresses for notices, consents, and payments are set forth in the Data Sheet. Either party may change its address for notices, consents and payments at any time by notice to the other. Notices may be given by a party or by its agent or attorney.

-21-

DEF000081

20.12    Counterparts.  This Lease may be executed in any number of duplicate originals, all of which shall be of equal legal force and effect.  Additionally, this Lease may be executed in counterparts, but shall become effective only after a counterpart hereof has been executed by each party; all said counterparts shall, when taken together, constitute the entire single agreement between parties.  This Lease may be executed and/or delivered by facsimile or electronic mail.  Signatures and/or copies of this Lease executed and/or delivered by facsimile or electronic mail shall be deemed to be originals.

20.13    Contingency.  This Lease and Tenant's obligations hereunder are strictly contingent upon Tenant securing the appropriate license with the City of Milwaukee which permits Tenant to serve beer and wine at the Premises.  In the event Tenant does not secure such license by October 31, 2016, this Lease shall terminate upon written notice to Landlord from Tenant indicating that Tenant is unable to acquire the beer and wine license.  Such termination shall be effective upon Landlord's receipt of such notice.

20.14    Exhibits.  The following Exhibits are attached to and by reference incorporated in this Lease:

| | | |
|---|---|---|
| (a) | Exhibit A: | Floor Plan of Premises, Including Tenant Equipment List |
| (b) | Exhibit B: | Landlord and Tenant Improvements Work Letter |
| (c) | Exhibit C: | Base Rent Schedule plus Additional Rent / Fees |
| (d) | Exhibit D: | Building Rules and Regulations |

[Signatures on the following page.]

DEF000082

SIGNATURE PAGE TO RETAIL LEASE

Dated as of the Date of Lease.

**LANDLORD:**

SHERMAN PHOENIX LLC

By: _____
Name: _____Juli Kaufmann_____
Title: _____Managing Member_____

**TENANT:**

_____

By: _____
Name: _____Joanna Brooks_____
Title: _____Owner, Embody YOGA_____

DEF000083

# EXHIBIT A

## FLOOR PLAN OF PREMISES

**TENANT PREMISES**



Exhibit A
Tenant Premises and Equipment List

DEF000084

**TENANT EQUIPMENT LIST**

| # | DESCRIPTION | QTY. | NOTES | ESTIMATED COST | PROVIDED BY | INSTALLATION |
|---|---|---|---|---|---|---|
| | | | EQUIPMENT SCHEDULE - EMBODY YOGA | | | |
| 1 | SOUND SYSTEM | 1 | | $400 | TENANT | TENANT |
| 2 | COVE HEATER | 6 | | $2700 | TENANT | TENANT |
| 3 | SEATING AREA | 1 | SOFA, CHAIRS, SIDE TABLES, FLOOR CUSHIONS AND PRODUCT STANDS | $1000 | TENANT | TENANT |
| 4 | WIRE SHELVING UNIT | 1 | | $80 | TENANT | TENANT |
| 6 | CUBBIES | 2 | SHOE/BENCH | $150 | TENANT | TENANT |
| 7 | COAT HOOKS | 5 | | $80 | TENANT | TENANT |
| 8 | POS SYSTEM | 1 | SQUARE STAND FOR CONTACTLESS OR CHIP SHOWN | $170 | TENANT | TENANT |
| 9 | MIRROR | 2 | DRESSING ROOM | $100 | TENANT | TENANT |
| 10 | BENCH | 2 | WOOD | $160 | TENANT | TENANT |
| 11 | CHAIR | 1 | TASK | $80 | TENANT | TENANT |
| 12 | PLANTERS | 5 | | $250 | TENANT | TENANT |

DEF000085

**EXHIBIT B**

## LANDLORD AND TENANT IMPROVEMENTS
## WORK LETTER

This Work Letter shall set forth the obligations of Landlord and Tenant with respect to the preparation of the Premises for Tenant's initial occupancy. All improvements described in this Work Letter to be constructed in and upon the Premises by Landlord are hereinafter referred to as "Tenant Improvements". Landlord and Tenant acknowledge that Plans (hereinafter defined) for the Tenant Improvements have been developed based on the Premises shown in Exhibit A. Accordingly, Landlord and Tenant agree that Landlord's obligation to pay for the cost of the Tenant Improvements as shown shall be limited to the current costs estimated at **$13,135** (the "Construction Allowance") and that Tenant shall be responsible for the cost of the Tenant Improvements to the extent that it exceeds the Construction Allowance. Landlord shall have the right to select and/or approve of any contractor or subcontractors used in connection with the Tenant Improvements.

Space planning, architectural and engineering (mechanical, electrical and plumbing) drawings for the Tenant Improvements shall be prepared by Landlord's contractor and architects. The space planning, architectural and mechanical drawings are collectively referred to herein as the "Plans".

Landlord has sole authority to approve Tenant Improvements, including but not limited to labor and materials, architect's fees, contractor's fees, equipment costs and permit fees. Landlord has worked in good faith to finalize and approve a proposal for equipment purchase. The equipment costs are estimated at in Exhibit A (the "Equipment Allowance") and Tenant is responsible for all costs associated with the Equipment Allowance. For any Equipment to be ordered and/or installed by Landlord, Tenant agrees to provide a 20% deposit within 30 days of the Date of Lease. The balance of equipment costs are payable no later than 90 days following the Date of Lease. Landlord will provide an invoice amount in advance of due date to Tenant for amounts payable.

Following approval of the Plans and the payment by Tenant of Tenant's Portion – the Equipment Allowance, Landlord shall cause the Tenant Improvements to be constructed substantially in accordance with the approved Plans, so long as no Tenant-caused default shall occur under the Lease. Landlord shall notify Tenant upon substantial completion of the Tenant Improvements. The phrase "substantially complete" or "substantial completion" shall mean that the Tenant Improvements have been completed except for such incomplete items for which completion thereof would not materially interfere with the use of the Premises.

DEF000086

## EXHIBIT C

### BASE RENT SCHEDULE

| Lease Year | Annual Base Rent | | Monthly Rent | |
|---|---|---|---|---|
| Year One | $ | 9,600 | $ | 800 |
| Year Two | $ | 9,888 | $ | 824 |
| Year Three | $ | 10,185 | $ | 849 |

For purposes of the foregoing Schedule, Lease Year One (1) is the period from the Commencement Date through the day before the first anniversary of the Commencement Date, provided that if such anniversary is not the last day of a calendar month, the Lease Year 1shall also include the additional days in the calendar month in which such anniversary occurs.

### ADDTIONAL RENT SCHEDULE

(1)     **Proportionate allocations** will be made for utilities;

(2)     **$25 fee** for employee parking ($25/ spot)**;**

(3)     **$35 fee** for cleaning and security; and

(4)     **$20** fee for internet;

Tenant shall pay to Landlord, without set off, deduction or demand, a total initial Base Rent plus above fees in monthly installments in advance on or before the first day of each month. Tenant agrees to complete necessary paperwork below and permissions to allow Landlord to make automatic bank or other payment withdrawals to provide Base month plus Additional Rent and Fees directly to Landlord by each monthly due date.

**BANK PAYMENT WITHDRAWAL INFO TBD:**

DEF000087

## EXHIBIT D

## BUILDING RULES AND REGULATIONS

    1.    Tenant shall not, whether temporarily, accidentally or otherwise, allow anything to remain in, place or store anything in, or obstruct in any way, any portion of the Building other than the Premises, including any sidewalk, driveway, passageway, entrance, exit, stairway, lobby, corridor, hall, or other area in or about the Building. All passageways, entrances, exits, stairways, corridors, halls and roofs of the Building are not for the use of the general public, and Landlord shall in all cases retain the right to control and prevent access thereto by all persons in whose presence, in the judgment of Landlord, shall be prejudicial to the safety, character, reputation or other interest of the Building, its tenants or Landlord; provided, however, that nothing herein contained shall be construed to prevent ingress and egress to persons with whom Tenant deals within the normal course of Tenant's business. Tenant shall not enter nor permit its employees, agents, guests or invitees to enter into areas of the Building designated for the exclusive use of Landlord, its employees, guests or invitees. Tenant shall not use, nor permit the use by its employees, agents, guests or invitees, of any common area in the Building other than for access to and from the Premises. No motorcycles shall be brought into the Building or kept on the Premises without the consent of Landlord.

    2.    No freight, furniture or bulky matter of any description will be received into the Building or carried into the elevators except in such a manner, during such hours as may be approved by Landlord, and then only upon having been scheduled in advance. Any hand trucks, carryalls or similar appliances used for the delivery or receipt of merchandise or equipment shall be equipped with rubber tires, side guards and such other safeguards as Landlord shall require.

    3.    Tenant, or the employees, agents, visitors or licensees of Tenant shall not at any time place, leave or discard any rubbish, paper, articles, or objects of any kind whatsoever outside the doors of the Premises or in the corridors or passageways of the Building. Tenant shall not permit any noise, odor or litter which is objectionable to Landlord or other tenants of the Building to emanate from the Premises other than those considered standard and ordinary in the operation of a full-service restaurant.

    4.    Any person in the Building will be subject to identification by employees and agents of Landlord. All persons in or entering the Building shall be required to comply with the security policies of the Building. Tenant shall keep doors to unattended areas locked and shall otherwise exercise reasonable precautions to protect property from theft, loss, or damage. Tenant shall not attach or permit to be attached additional locks or similar devices to any door or window, change existing locks or the mechanism thereof, or make or permit to be made any keys for any door other than those provided by Landlord. If more than two keys for one lock are desired, Landlord will provide them upon payment therefore by Tenant. Upon termination of this Lease, or of Tenant's possession, Tenant shall surrender to Landlord all keys to the Premises. Landlord shall not be responsible for the theft, loss or damage of any property. Landlord may at all times keep a pass key to the Premises. Canvassing, soliciting or peddling in the Building is prohibited, and Tenant shall cooperate to prevent same.

    5.    Tenant shall not mark, paint, drill into or in any way deface any part of the Building or Premises. No boring, driving of nails or screws, cutting or stringing of wires shall be permitted, except with the prior written consent of Landlord, and as Landlord may direct. Tenant shall not install any resilient tile or similar floor covering in the Premises except with the prior approval of Landlord.

    6.    Tenant shall give immediate notice to Landlord in case of theft, unauthorized solicitation or accident in the Premises or in the Building or of defects therein or in any fixtures or equipment, or of any known emergency in the Building.

    7.    Tenant shall at all times keep the Premises neat and orderly.

    8.    Tenant shall not make excessive noises, cause disturbances or vibrations or use or operate any electrical or mechanical devices that emit excessive sound or other waves or disturbances or create obnoxious odors, any of which may be offensive to the other tenants and occupants of the Building, or that would interfere with the operation of any device, equipment, radio, television broadcasting or reception from or within the Building or elsewhere and shall not place or install any projections, antennas, aerials or similar devices inside or outside of the Premises or on the Building without Landlord's prior written approval other than those considered standard and ordinary in the operation of a full-service restaurant.

9.      Tenant shall comply with all applicable federal, state and municipal laws, ordinances and regulations, and building rules and shall not directly or indirectly make any use of the Premises which may be prohibited by any of the foregoing or which may be dangerous to persons or property or may increase the cost of insurance or require additional insurance coverage. Tenant shall not bring or store firearms of any kind into the Building. Tenant shall not use the Premises for the manufacture, distribution or sale of any merchandise or other materials. Tenant shall not install any equipment utilizing ammonia or other process necessitating venting.

10.      The water and wash closets, drinking fountains and other plumbing fixtures shall not be used for any purpose other than those for which they were constructed, and no sweepings, rubbish, rags, coffee grounds or other substances shall be thrown therein. All damages resulting from any misuse of the fixtures shall be borne by Tenant whose employees, agents, visitors or licensees, shall have caused the same. No person shall waste water by interfering or tampering with the faucets or otherwise.

11.      Except as otherwise provided in the Lease, Tenant shall not employ persons to do janitor, repair or decorating work in the Premises, and no persons other than the janitors or contractors designated by Landlord shall clean, decorate, remodel or repair the Premises without prior written consent of Landlord.

12.      Tenant shall not install or operate any refrigerating, heating or air-conditioning equipment, nor any equipment of any type or nature that will or may necessitate any changes, replacements or additions to, or in the use of, the water system, heating system, plumbing system, air-conditioning system or electrical system of the Premises or the Building, without first obtaining the prior written consent of Landlord. Business machines and mechanical equipment belonging to or installed by or at the direction of Tenant that cause noise or vibration capable of being transmitted to the structure of the Building or to any space therein to such a degree as to the objectionable to Landlord or to any tenant in the Building shall be installed and maintained by Tenant, at Tenant's expense, on vibration eliminators or other devices sufficient to reduce such noise and vibration to a level satisfactory to Landlord and such other tenants.

13.      Landlord reserves the right to prescribe and to approve the weight, size and location of safes, book shelves and other heavy equipment, fixtures and articles in and about the Premises and the Building and to require all such items to be moved in and out of the Building and the Premises only at such times and in such manner as Landlord shall direct and in all events at Tenant's sole risk and responsibility. Tenant shall not overload any floors.

14.      Tenant shall not, without the prior written consent of Landlord, install any shades, draperies, blinds or other window covering, awning, sign, lettering, picture, notice, advertisement or object unacceptable to Landlord on or against glass partitions, doors or windows that would be visible outside the Premises or any sign, lettering, picture, notice or advertisement within the Premises that would be visible outside the Premises. Landlord shall have the right to prohibit any advertisement of or by Tenant in any public media, by direct solicitation or otherwise, which advertisement, in Landlord's opinion, tends to impair the reputation of the Building or its desirability as a high-quality office building. Upon written notice from Landlord, Tenant shall immediately refrain from and discontinue any such advertisement.

15.      Landlord reserves the right to rescind, add to and amend any rules or regulations, to add reasonable new rules or regulations, and to waive any rules or regulations with respect to any tenant or tenants.

16.      Tenant shall not use space heaters or other energy-intensive equipment to conduct tenant's business without written approval by Landlord.

17.      Tenant acknowledges that it is Landlord's intention that the Property be operated in a manner which is consistent with Landlord's sustainability practices. Tenant is required to comply with these practices within its Premises.

DEF000089